## STATE OF FLORIDA v. OSBORNE
Case No. 83-44893 TT A02
County Court, Palm Beach County, Criminal Division
December 1, 1983

Mike Lebedecker, Asst. State Attorney, for plaintiff.

Steven W. Gomberg, for the defendant.

EDWARD FINE, County Judge

This action came before the Court upon the Defendant's motion to suppress certain evidence. He seeks to suppress a .20 blood alcohol reading. The reading was obtained shortly after his arrest on charges of driving under the influence of alcoholic beverages to the extent that his

---

normal faculties were impaired[1] and; driving with an alcohol-blood concentration of .10 per cent (.0010) or above.[2]

A breath-testing instrument—the Breathalyzer, was used to analyze the alcoholic content of the defendant's breath. Once the breath concentration was analyzed it was automatically converted by the Breathalyzer machine into units of *blood*-alcohol concentration.

Driving with a blood-alcohol concentration of .10 per cent (.0010) or above is a crime in Florida. Defendant's breathalyzer reading was .20 per cent (.0020) or double the lawful amount.

Defendant is also charged with driving while his normal faculties were impaired by alcohol. If defendant has .10 per cent or more alcohol in his blood, it is *prima facie* evidence that he is guilty of this charge.[3] The .20 Breathalyzer reading is twice this amount.

The Breathalyzer machine readout of .20 per cent is a critically important piece of evidence. It's accuracy is also critical because:

    A. It will be heavily relied upon by the jury as being an objective measure of the defendant's guilt or innocence.

    B. The test can not be verified by independent testing because no breath sample was preserved.

The defendant claims that there are simple, inexpensive, expedient, state-approved means to preserve and later test an actual sample of the defendant's breath taken at the time he blew into the Breathalyzer machine. If this breath had been adequately preserved it could have been re-tested to confirm or refute the Breathalyzer readout. The defendant claims that the means to preserve the sample were so simple and the effort needed so minimal, that to not have done so but yet to submit the Breathalyzer readout against him is fundamentally unfair, a violation of Article I section 9 of the Florida Constitution and Amendment 14 of the U.S. Constitution, which provide in part that the State may not deprive any person or life, liberty or property without due process of law.

The State contends that the introduction of the Breathalyzer machine reading is not unfair and is not a denial of due process since:

    A. Breath preservation methods have not been proven to be technologically sound.

---

[1] §316.193(1)(a), Fla. Stat. (1982).

[2] §316.193(1)(b), Fla. Stat. (1982).

[3] §316.1934(2)(c), Fla. Stat. (1982).

B. The defendant has no right to make the police gather evidence for the defense.

Today's issue is not a new issue. It first arose in Palm Beach County in 1978.[4] It arose even earlier in other jurisdictions.[5]

Around the State and throughout the country, trial judges and panels of appellate judges have failed to reach a uniform decision on today's issue, but though this conflict in judgment is unsettled, though different courts will decide differently, still a decision has to be made in this case.

The Court decides that it is a denial of due process of law for the State to introduce a Breathalyzer readout into evidence without having made a minimal effort to preserve an additional sample of the tested breath. The Court reasons that:

In order for a breath test result to be admissible the test must be administered after the suspect has been arrested.[6] The machine test is used as a tool to investigate and gather evidence, not as a means of deciding whether to arrest a person. If an arrested person had a .0000 breathalyzer machine readout he would still be under arrest.

The Breathalyzer machine is a spectrophotometer. Two ampules, which are small vials of liquid, are placed in the machine between a light bulb and a light meter. There is a dial on the machine that adjusts the machine so that the light meter is in equilibrium between the light being read through one vial and the light being read through the other vial. One of the vials is unsealed, a tube is inserted into it and the suspect blows into the Breathalyzer machine.

The machine traps and then pumps a specified volume of the defendant's breath through the tube and into the vial. If there is alcohol present in the breath a chemical reaction will lighten the color of the liquid in the opened vial. The light meter then will pick up an imbalance between the amount of light passing through the two vials, the sealed vial having less light passing through it than the lighter test vial. The change will be reflected in the movement of a sensitive needle on the Breathalyzer machine.

The movement of the needle is caused by the reaction of the light meter, which in turn is caused by a color change, the result of a chemical reaction, which is directly proportional to the amount of alcohol in the defendant's breath, which is in turn directly proportional

---

[4]*State v. Walker*, 77-68583 TT A04 (Palm Beach County).

[5]*People v. Hedric*, 557 P. 2d. 378 (Colo. 1976).

[6]§316.1932, Fla. Stat. (1982).

to the amount of alcohol in the defendant's blood. By noting the movement of the needle, a reading is obtained indicating the machine's readout of the alcohol-blood concentration of the subject.

In 1978 in the local case of *State v. Walker*, 77-68583 TT A04, the testimony of the inventor of the Breathalyzer machine, William Borkenstein was taken. He stated that Florida has among the highest standards in the nation for the maintenance, testing and operation of the Breathalyzer. These high standards were set and are maintained by the Department of Health and Rehabilitative Services about which more will be noted below.

Only licensed operators may operate these machines. In Palm Beach County licensed Breathalyzer operators are on call day and night in order to test someone. They often operate out of the Sheriff's Department mobile breathalyzer testing units which are called Batmobiles. These are vans equipped with Breathalyzer equipment and video tape equipment. These vans allow video tape and breathalyzer equipment to be transported nearer to the location of arrests for DWI cases in order to cut down on the time delay between the time a person is arrested and the time that they are actually tested. These vans cost approximately $40,000 each when fully equipped.

The use of the vans and the video tape equipment has substantially improved the fairness of DWI trials. Juries through the use of video tape now have the ability to see and hear a defendant soon after the time of his arrest. Before the use of a video tape there was often no direct evidence of the defendant's condition. All evidence was indirect, namely the recollection and characterizations of eye witnesses and a Breathalyzer machine reading.

The Indian Crimper crimps a soft metal tube approximately four inches long made of indium, which is a metal that when pressed together self-welds. These tubes cost $10.00 each. The suspect blows by way of a hose into a bag, once the bag is full the air is directed into the indium tube. As the breath enters the tube the police officer uses the crimper, which is a specially manufactured box with a set of crimping jaws inside ($250.00). The crimper is placed around the tube and with a small amount of pressure welds the tube into three separate sections. Each section contains a separate sample of the breath. The samples are then labeled for identification and delivered to the crime laboratory for instrument testing by an Intoxilyzer ($4,000.00). There are three samples, two of which can be used by the State and one reserved for defense use, thereby giving three readings to compare on a single DWI investigation.

The 3,000 or so DWI convictions per year in our county result in fines levied in excess of $700,000 since the minimum fine is $250.00.

The funds collected are remitted to the cities when their police officers make the arrests, and to the County when the Sheriff's Department makes the arrest.

For $13,000.00, Sarasota County purchased all new indium crimper equipment, provided training on the equipment and a year's worth of maintenance and supplies. Sarasota offset these costs by adding $15.00 to the fine of each convicted offender.[7] Under this system Palm Beach County could defray costs of $40,000.00 per year.

With over one half million dollars annually in fines for DWI convictions and a system that defrays much if not all of its own costs today's decision diverts only a rivlet from the cash flow.

Today's opinion does not deal with the use of the Batmobile and its video equipment. Today's issue is concerned only with the admissibility of the readout from the Breathalyzer machine when no effort is made to preserve a breath sample.

If in the past a particular case were presented and then today the same case were presented but the facts were the opposite, one could assume that today's decision would be the opposite of the decision in the past. We have somewhat that situation in today's case.

When today's issue came up in 1978 in the *State v. Walker, supra*, the Court ruled that the police were not required to obtain and preserve breath samples for the defendant. The Court based its reasoning and quoted extensively from the case of *People v. Hedrick*, 557 P. 2d 378 (Colorado, 1976). The Court also cited other cases upholding its ruling, cases from Arizona, Oklahoma, New Jersey and Maine.

Since *State v. Walker, supra*, there have been several significant developments. The main case upon which the Court relied, *People v. Hedrick* has been completely reversed and overruled by its own judges in *Garcia v. District Court*, 589 P. 2d 924 (Colorado, 1979). The court in *Garcia* explained why it was reaching a conclusion directly opposite the one it had reached before. They stated that their earlier decision was based on opposite facts. At the time of their earlier decision, 1976, there was not a readily available way to preserve a breath sample. By the time of their Garcia decision (1979) there was an easy and economical and readily available way to preserve a breath sample. They held that: in balancing the rights of the person against the functions of governments it would be unfair not to require the government to go to some minimal

[7]Butcher T., *Breath Testing in the State of Florida, Current Developments*, Bureau of Highway Safety, Division of Public Safety Planning and Assistance, Department of Veteran and Community Affairs.

effort to ensure that an accused was not the victim of an incorrect machine reading. The Court now requires the State to preserve a breath sample for independent analysis by the accused. In the same year 1979, and for the same reasons, Arizona another jurisdiction relied upon in Palm Beach County also reversed its position in *Boca v. Smith*, 604 P. 2d 617 (Arizona, 1979).

In Florida, no analysis of breath by a Breathalyzer is admissible unless the machine has been approved, maintained and operated in accordance with all the pertinent rules and regulations of the Department of Health and Rehabilitative Services. The same holds true for the Indium Crimper which has also been approved for use by the Department of Health and Rehabilitative Services.

The Florida Supreme Court ruled in *State v. Bender*, 382 So.2d 697 (Fla. 1980) that it is the Department of Health and Rehabilitative Services and not the courts that determine what instruments are sufficiently technologically reliable to have their test results admitted into evidence. This agency, HRS, has approved both the Breathalyzer machine and the Indium Crimper apparatus and test equipment.[8]

When the Breathalyzer reading is offered into evidence in each case, the State does not have to prove by expert testimony that the instrument is technologically reliable. To be required to do so would require expert scientific testimony on this point in thousands of cases. The better solution is Florida's. The technological reliability of breath testing instruments is determined by the appropriate state agency. Thereafter its results are admissible in court so long as the tests are performed in accordance with that agency's pertinent rules and regulations. The same holds true for the Indium Crimper.

As a matter of law, it is HRS and not the court that determines the technological reliability of breath testing equipment and HRS has determined that the Indium Crimper is just as reliable as the Breathalyzer for courtroom purposes. The court decides if this evidence is admissible or not for other reasons.[9]

One of the arguments advanced in this case by State and in all similar cases is that the police do not have an obligation to investigate a case for the benefit of the defense. This is a true statement if the method of investigation does not infringe on the defendant's constitutional rights, such as by the loss of evidence. If the police use a method of investigation

---

[8]10 DER 28-145.

[9]*State v. Bender*, 382 So.2d 697 (Fla. 1980), §316.1934(2)(3), Fla. Stat. (1982).

that loses favorable evidence, then the police may not use testimony based on the lost evidence against the defendant.[10]

There is no justification in terms of interfering with police functions for not obtaining a breath sample. The government by law has the right in DWI cases to insist that a person provide breath or submit to the extraction of blood or provide a urine specimen. A refusal of such a police request results in a penalty: a six month suspension of driving privileges. On the other hand if the police want a confession from the same person they must inform the defendant that he has the right to remain silent, that no threats or promises can be used to induce him to say anything. If a defendant confesses the jury is cautioned not to rely on the confession without having carefully considered when, where and how it was obtained. If a defendant has a blood alcohol level in excess of .10 per cent the jury is not told to consider how, when, where and why the instrumental analysis was obtained, they are told that it is a presumption of guilt. In a breathalyzer situation the defendant need not be and thus never is, told that he has the right to an independent test. In a confession situation the defendant must be completely informed of all of his rights.

If the police obtain blood or urine they save what they do not use. Now that it is technologically simple, there is no longer any reason why the same rule does not apply to breath.

The State argues, unreasonably, that the defendant's breath is not in their possession. Every defendant similarly situated has first been arrested and then transported, usually handcuffed behind his back, in a police car to a Batmobile or to the station. At that time the government has enough possession of the defendant: to have him perform touching his nose with his finger, picking up coins, walking and turning, and standing still with his head back, all often before a camera. In addition they can obtain all the breath they reasonably need and they can hold him until they are through booking him.

With a minimum of effort, they can preserve a reasonable amount of breath for later testing. The police definitely control and possess such a defendant.

A person under arrest, who is required to breathe into the Indium tube does not have to fear that a mistake in the operation of the Breathalyzer machine will wrongfully convict him since he will have the recourse of having his own separate breath sample independently tested. With the use of the Indium Crimper there are three separate samples of breath to

[10]*Stipp v. State*, 371 So.2d. 712 (Fla. 4DCA 1979); *State v. Johnson*, 280 So.2d 673 (Fla. 1973); *State v. Littlefield*, 82-165468 TT A04 (Palm Beach County).

test. The weight of these test results should contribute substantially to accurately convicting the guilty and freeing the innocent.

This decision will result in the inability to use the results of a breath test against defendants in pending cases until indium crimper equipment or its equivalent is obtained. This equipment can be obtained quickly. Not all, but many of these defendants in the meantime can still be prosecuted on their statements, eye witness testimony and video tape evidence.

The only unique feature in this case is that rather than saving a solid such as marijuana or a liquid such as urine, the police must save a gas. The Court is today holding that the police must make a minimal effort to preserve a container of the defendant's breath for later independent testing.

This is not an unexpected overnight decision. Florida courts have been deciding that breath samples must be preserved, since 1981.[11]

It is the decision of the Court that the Defendant's motion to suppress is granted. The State may not introduce evidence of the results of the Breathalyzer test administered in this case.

---

[11]*Cook v. Florida*, 80-1276 AP-01 (Sarasota County, 1981).